IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE NO. 1:22 CR 8

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | **SENTENCING MEMORANDUM** |
| vs. ) | **AND REQUEST FOR VARIANCE** |
| ) | |
| MICHAEL IRVIN HUGHES ) | |

*Michael Hughes*

Michael Hughes will turn 54 years old in a few weeks. He would have graduated from high school in 1987 had he finished. Instead, he dropped out of school after the eleventh grade and, like many who have followed that path, spent the next decade or so finding his way.

While somewhat aimless, the time from the mid 1980s to the mid 1990s was insignificant to what law enforcement would later call Mr. Hughes's "criminal history." As the court can see in the Presentence Investigation Report (hereinafter "PSI"), Mr. Hughes did have his scrapes with the law, mostly misdemeanors and all of the minor variety (depending on how one views Driving while Impaired by alcohol). The single arguable exception was a break-

in/larceny at age 28 in which he served as a lookout for his older acquaintances.[1] Significantly, the only substances with pharmacological effect which Mr. Hughes used (or, again depending on one's perspective, abused) during this time were alcohol and marijuana.

In his late 20s, Mr. Hughes both grew up and he didn't. For the most part, the changes in his life were positive. He had learned auto upholstery from his uncle and for ten years worked full time in an auto repair shop in Rutherford County. Colleagues from this time describe[2] an outstanding craftsman — one told Mr. Allard that Mr. Hughes was "one of the best in the business" — whose work was sought by multiple drivers and car owners in the then-burgeoning[3] NASCAR industry in southwestern North Carolina. For over a decade Mr. Hughes, despite his lack of education, earned a good living working on cars. In

---

[1] Mr. Hughes is adamant that he takes responsibility for getting involved in this activity. Counsel is quicker to point out that the older acquaintances also prosecuted were his older brother and his brother's friends. While 28 years old is near the age limit for "tagging along" with an older sibling, this type of crime is precisely the type of youthful ignorance of consequences which hardly presages a life of anti-social behavior.

[2] Current counsel has substituted for the Federal Defender in this case, and the information regarding Mr. Hughes's personal history is largely reported from investigation done by Jim Allard in that office. Since Mr. Hughes and his then-counsel did participate in the PSI process, current counsel does not know why the information is not in the PSI.

[3] Counsel recognizes that the sport long predates the 1990s. However, the amount of interest in the races — and the consequent torrent of money flowing to those who worked to maintain the endeavor — exploded in the 1990s and 2000s.

2011, as the business owners for whom he worked he worked considered retirement, Mr. Hughes decided to open his own shop. Unfortunately, as is all too common, he would prove a better craftsman than he was a business owner. Even worse for his future, Mr. Hughes would develop an addiction to methamphetamine.

Mr. Hughes's introduction to methamphetamine was a common one. When he was making good money and his living expenses were low, the "entertainment" provided by a short-term high was both desirable and affordable. Not uncommonly for those in this situation, however, what would have been a relatively minor health setback snowballed into the near-complete destruction of what he thought he had built. Around 2011, Mr. Hughes was (literally) struck by lightning, and tired very quickly in the few months following.[4] Mr. Hughes used the methamphetamine for its medicinal properties in greater amounts while still using it for recreation. In doing so, he spent a larger amount of his income on drugs while simultaneously leaving less of the day to work. Unsurprisingly, under these circumstances, the business largely failed.

As the last decade has revealed, Mr. Hughes might have been better off had his auto work disappeared rather than diminished. Because his particular

---

[4] To this day, Mr. Hughes retains some numbness in his feet. It is likely that as he ages, he will lose his mobility earlier than most.

skill allowed him to continue working in the industry, he was able to make enough in the legitimate economy to scrape by. However, by working for people he had met in the methamphetamine business, he was able to combine the two to make the same living he had before the injury and the failure of his business.[5] It is important to consider, especially given the conclusion which might be drawn from both his designation as a "career offender" and the large amount of methamphetamine attributed to him by the sentencing guidelines, that Mr. Hughes never made much money from the methamphetamine business even after his income from the legitimate economy diminished.

*Mr. Hughes's "criminal history"*

The PSI concludes that Mr. Hughes is a "career offender."[6] A closer look at the record of convictions reveals that the dehumanizing term used by the sentencing guidelines does not at all describe Mr. Hughes's record in plain English.

As noted above, Mr. Hughes's criminal history from age 19 through age 28 is not hugely atypical for a young man without family means and little

---

[5] By this time, the existing business for which he worked had closed, the owners having retired.

[6] Mr. Hughes did not object to that conclusion and does not now argue that the sentencing guidelines were not correctly interpreted. This portion of the argument simply outlines why such a conclusion overstates Mr. Hughes's "criminal history" and results in a guideline range grossly disproportionate to a rational enhancement for recidivism.

education.[7] While petty theft and DWI offenses are not admirable behavior, they are not the type of offense which someone unfamiliar with the United States sentencing guidelines would consider — unless prompted to consider a literal meaning of the term — a *criminal* history. To one not versed in the language of retribution, they indicate youth and aimlessness more than malice or meanness. Even Mr. Hughes's misdemeanor assault in 2003 — certainly an offense which the average person would be concerned about — was a single act of domestic violence within a deteriorating relationship which, importantly, *was never repeated.* Even more importantly, that misdemeanor assault — nineteen years ago — was the last criminal act that Mr. Hughes committed that did not involve the possession or distribution of drugs. Many believe that entry into the drug market, either as a buyer or a seller, is not itself anti-social behavior as long as the parties involved are entering willingly into an arms-length transaction. Mr. Hughes certainly understands that the prosecutor and the court do not hold this belief. Still, within the context of guidelines which recommend a sentence *greater than twenty-four years imprisonment*, the court must consider that in nearly twenty years[8], Mr. Hughes has committed no action against anyone who did not want

---

[7] Mr. Hughes does not intend to imply by this argument that these offenses were used in his "criminal history" calculation. They were not.

[8] Mr. Hughes has served a little less than two years in prison in his life. Even if the court discounts that time, he has spent the vast majority of the last nineteen years refraining from hurting anyone without their approval.

Mr. Hughes's action to occur. To describe him as a career criminal based on this record is extremely misleading and even worse, cheapens the meaning of career offender when applied to people who truly do repeat traditionally criminal acts like theft or assault over a period of time.

Examining the drug offenses which comprise Mr. Hughes's criminal record over the last two-decades shows that they, too, render the "career offender" designation misleading. In 2015, Mr. Hughes possessed with intent to distribute 0.2 grams of methamphetamine. In 2016, he possessed with intent to distribute approximately 3 grams of methamphetamine. And in 2018, he possessed with intent to distribute 6.2 grams of methamphetamine. In the aggregate, therefore, Mr. Hughes's "career" involves having been punished for methamphetamine with a street value of around $200.[9] While it is clear that Mr. Hughes is a recidivist as contemplated by the guidelines, it is equally clear from the enormous mathematical increase of the enhancement that it was intended to apply to recidivists whose contribution to the national market for controlled substances far outweighs that of Mr. Hughes.

*Role in the Offense*

---

[9] Mr. Hughes does not intend to claim that the offenses for which he was punished are the only times he has possessed with intent to distribute methamphetamine. He does, however, claim that his level of involvement in the drug trade hardly merits the "kingpin" level enhancement that the recidivism guidelines recommend.

The court has undoubtedly noted that the amount of methamphetamine (and cash) attributed to Mr. Hughes is large. There is no evidence in the discovery that either the drugs or the cash belonged to him. Indeed, Mr. Hughes expects the government to agree with his position that he was holding the drugs and the money for someone else, likely someone known or suspected by law enforcement. Mr. Hughes reports that he was paid in the neighborhood of $1500[10] per occasion for holding the methamphetamine and cash to be picked up by others per instructions provided to Mr. Hughes, and there is no evidence in the case to suggest otherwise. Mr. Hughes, in a decade of small-time drug distribution, has never made a significant amount of money doing so (again, a conclusion with which he expects the government to agree). In such a situation, the lengthy sentence recommended by the guidelines is at cross purposes with both the retribution-based *and* the deterrence-based purposes listed in 18 U.S.C. § 3553. A system whereby the person making a large profit in the drug distribution business receives no sentence (or, more accurately, is sentenced to the lost profit from the drugs and cash lost to the government) and the person receiving a small wage for doing a job receives a sentence of decades of imprisonment is neither deterrent nor rationally retributional.

---

[10] While not necessarily relevant to the length of the sentence, the court should recognize that most of Mr. Hughes's "salary" went to purchasing methamphetamine from his employer and thereby contributing to that person's profit from the industry.

*Conclusion and Request for Sentence*

While publicly denied by employees of the Department of Justice and the United States courts, it is clear to everyone else that lengthy sentences for drug trafficking (or, for that matter, recidivism) do not have any deterrent effect. Since declaring war on drugs over 50 years ago — and repeatedly updating the weaponry with longer and longer sentences — it is rare to find anyone outside the employ of the government who denies that the drugs won. Over time, the cost and lethality of drugs has increased. The opportunity cost lost due to the failure to invent safer, more effective pharmaceuticals to be brought to market inexpensively is indeterminable but undoubtedly quite large. Therefore, the only purpose of sentencing served by any sentence at all is the denunciation of drug traffickers by people who don't approve of the product — in other words, telling people like Mr. Hughes that the way he survived in the world was wrong.[11]

This case starkly raises the question how much imprisonment is greater than necessary to make the point that the government believes distributing methamphetamine is wrong. The statute determining Mr. Hughes's sentence specifically states that the court must not impose a sentence "greater than necessary" to do so. 18 U.S.C. § 3553(a). Mr. Hughes is likely to tell the court at

---

[11] On this point, that trafficking in methamphetamine is to be denounced, it is certainly true that believers in the principle — perhaps many of them — are found outside of government. Significantly, those people do not have to personally confront the denounced during the ceremony.

his allocution that he is aware that the court believes that serving the market for methamphetamine is maximally wrong. Mr. Hughes is also likely to assert — in counsel's opinion, honestly assert — that he agrees with the court that it is wrong and expects to be punished for his contribution to the market. He hopes, however, that the court considers a few statistics which reveal the folly — and cruelty — of sentences measured in decades even for methamphetamine.

According to Customs and Border Patrol, the government, in 2020, seized more than 80 million grams (80,601 kg) of methamphetamine at U.S. borders. USCBP, Drug Seizure Statistics (2020). While it is unknown — and counsel is not prepared to submit a document in federal court which contains a wild guess — what proportion of the total amount which traffickers sought to traffic was seized, it is reasonable to assume that the amount seized by one agency in one context is a tiny fraction of the total amount intended to serve the market. In that context, the roughly 6 kilograms of methamphetamine reasonably foreseeable by Mr. Hughes is an infinitesimal portion of the national market (and likely still a small portion of the local market). More importantly, as mentioned above, *the vast majority of methamphetamine traffickers are not caught*, resulting in the irrational argument that it is *necessary* to punish those in court with decades of imprisonment when most of the people engaging in identical activity receive no sentence of imprisonment.

The methamphetamine market is overstated, as well, by the prevalence of the cases brought in federal court. According to the annual national survey by the Substance Abuse and Mental Health Services Administration, the number of *heavy* alcohol users in the United States in 2020 was 22.3 million people. SAMHSA Statistics (2020). The number of people who *misused* psychotherapeutic drugs was 16.1 million and the number of people who used cocaine was 5.2 million people. Id. By contrast, the number of people who used methamphetamine in the United States was 2.5 million people. Id. It is simply incorrect to label the methamphetamine market as larger than other markets for abused drugs *simply because methamphetamine is illegal*. Specifically in Mr. Hughes's case, the customers of the methamphetamine foreseeable to him numbered in the dozens. As is true regarding the amount of methamphetamine in the American market as compared to the market in which Mr. Hughes was involved, the customer market attributable to Mr. Hughes is infinitesimal and most who enter that market for customers receive no sentence.

The most important statistic regarding Mr. Hughes's argument that the proposed sentence is far more than necessary is that the median sentence in 2021 in federal court for methamphetamine traffickers *who are career offenders* was 144 months imprisonment, more than twelve years less than the advisory guidelines call for in this case. It is the most important statistic because the sentencing

statute itself requires the court to consider "unwarranted sentencing disparities," and, for all the reasons argued above, it is impossible to contemplate how a sentence more than double the median is "warranted" in this case.

Expecting a request from the government for a below-guidelines sentence, (though not as low as he hereby requests), Mr. Hughes requests a sentence of 120 months imprisonment. Approximately half of the guideline sentence is appropriate in a case where the government joins in the request for a lower-than-the-guidelines sentence, and the additional two years represents the facts, as outlined above, that Mr. Hughes's conduct, as compared to other methamphetamine traffickers who are career offenders pursuant to the sentencing guidelines, merits less of a sentence than the median 144 months imprisonment. Ten years remains more than necessary to impress upon Mr. Hughes that the Department of Justice and the United States Courts believe the trafficking of methamphetamine to be wrong — especially for a middle aged man whose time remaining is less than that of a young person being sentenced — but given the median sentence imposed upon people with similar records and conduct, such a sentence would avoid unwarranted disparities within the Bureau of Prisons.

THIS the 21st day of November, 2022.

/s/ Eric J. Foster
Attorney for the Defendant
22 South Pack Square, Suite 300
Asheville, North Carolina 28801
(828) 771-4787
rickfoster200@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Sentencing Memorandum on the following by filing it electronically with the Court.

>Mr. Thomas Kent
>Assistant United States Attorney

THIS the 21st day of November, 2022.

/s/ Eric J. Foster